****CORRECTED COPY – DESTROY ALL OTHERS****

# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

**v.**

## Air Force Cadet STEPHAN H. CLAXTON
## United States Air Force

## ACM 38188 (rem)

## 31 October 2016

Sentence adjudged 22 June 2012 by GCM convened at the United States Air Force Academy, Colorado.  Military Judge:  J. Wesley Moore (trial) and Natalie Richardson (DuBay).

Approved Sentence:  Dismissal, confinement for 6 months, and forfeiture of all pay and allowances.

Appellate Counsel for the Appellant:  Major Thomas A. Smith and Captain Jarrett F. Merk.

Appellate Counsel for the United States:  Major Mary Ellen Payne, Major Jeremy D. Gehman, and Gerald R. Bruce, Esquire.

Before

MAYBERRY, DUBRISKE, and J. BROWN
Appellate Military Judges

OPINION OF THE COURT
UPON REMAND

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

MAYBERRY, Senior Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of engaging in wrongful sexual contact with a female cadet at the United States Air Force Academy (Academy), assaulting a former female cadet and attempted abusive sexual contact with her, and assaulting two male cadets, in violation of Articles 80, 120,

and 128, UCMJ, 10 U.S.C. §§ 880, 920, 928.[1]  The adjudged and approved sentence consisted of a dismissal, confinement for six months, and forfeiture of all pay and allowances.

During his original appeal to this court, Appellant alleged the military judge erred by not giving a voluntary intoxication instruction for the wrongful and abusive sexual contact offenses or, in the alternative, that his trial defense counsel was ineffective for waiving the instruction.  Finding no error materially prejudicial to the substantial rights of Appellant, we affirmed.  *United States v. Claxton*, ACM 38188 (A.F. Ct. Crim. App. 17 December 2013) (unpub. op.).

On 1 December 2013, two weeks before this court issued its initial decision, a newspaper in Colorado Springs published a front page article regarding the recruitment and use of cadets as confidential informants (CI) by the Air Force Office of Special Investigations (AFOSI) at the Academy.[2]  Eric Thomas, a former cadet, was quoted extensively in the article describing his alleged work with AFOSI, including work on Appellant's case.[3]

On 14 February 2014, Appellant submitted a petition for a new trial with the Judge Advocate General of the Air Force pursuant to Article 73, UCMJ, based on the "newly discovered evidence" regarding Cadet Thomas's role as a CI in Appellant's case.  That request was denied on 27 May 2014.  On appeal to our superior court, Appellant alleged for the first time that the Government's failure to disclose Cadet Thomas was a CI for AFOSI constituted a discovery violation that was not harmless beyond a reasonable doubt.  Our superior court granted review of the following issue:

> WHETHER THE GOVERNMENT'S FAILURE TO DISCLOSE THAT UNITED STATES AIR FORCE ACADEMY CADET ERIC THOMAS WAS A CONFIDENTIAL INFORMANT FOR THE AIR FORCE OFFICE OF SPECIAL INVESTIGATIONS (AFOSI) PURSUANT TO BRADY v. MARYLAND, 373 U.S. 83 (1963), WAS HARMLESS BEYOND A REASONABLE DOUBT.

It subsequently set aside our prior decision and remanded the case for a hearing pursuant to *United States v. DuBay*, 37 C.M.R. 411 (1967), to make findings of fact and conclusions of law related to this discovery issue.  *United States v. Claxton*, 73 M.J. 478 (C.A.A.F. 2014).  That hearing was conducted and the case is back before us for further review under Article 66(c), UCMJ, 10 U.S.C. § 866(c).  *Id.*

---

[1] Appellant was acquitted of engaging in wrongful sexual contact with another former female cadet.

[2] *See* Dave Phillips, *Honor and Deception*, The Gazette, 1 December 2013, *available at* http://www3.gazette.com/projects/project/usafa-informant-program/.

[3] Mr. Thomas was disenrolled in April 2013.

While this case was pending before us on remand, our superior court issued *United States v. Adams*, 74 M.J. 137 (C.A.A.F. 2015) and *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016). We thus specified two additional issues for briefing by the parties: whether adequate independent evidence was admitted into evidence to corroborate the essential facts of Appellant's pretrial admissions and/or confessions in accordance with *Adams*; and whether the findings and sentence must be set aside in light of *Hills*.

We adhere to our earlier decision rejecting Appellant's assertions that he was materially prejudiced by the military judge's failure to provide the voluntary intoxication instruction and that his trial defense counsel were ineffective. *See Claxton*, ACM 38188 at 3-6. As to the *Brady* and *Hills* issues, we find error, but that it was harmless beyond a reasonable doubt. As to the *Adams* issue, we conclude that the assault consummated by a battery for kissing Ms. SW was not corroborated. We thus set aside that finding but affirm the sentence as approved.

*Background*

Appellant was convicted in June 2012 of sexual offenses involving two women based on his conduct on two separate occasions in 2011. First, he was convicted of engaging in wrongful sexual contact with Cadet MI, stemming from an incident that occurred in his dormitory room in late March 2011 after she, Appellant, and two other male cadets (including then-Cadet Eric Thomas) drank mixed drinks and played cards for several hours. Cadet MI had never met Appellant before this evening. She ended up vomiting due to her over-consumption of alcohol and then fell asleep in the bed of Appellant's roommate while the three male cadets watched a movie. She was awakened when a hand or arm brushed against her head and then someone got into the bed behind her. Cadet MI testified that she was terrified and "froze" as the person grabbed her hand, pulled it behind her back, and placed it on his penis. She then pulled her hand away, got out of the bed, and vomited into a nearby trashcan. At this time, she realized Appellant had been the person in the bed with her and they were alone in the room.[4]

The second incident occurred on 4 November 2011, after Appellant and some friends (again including Cadet Thomas), drank alcohol together at several downtown businesses. The group included Ms. SW, a former cadet, who became intoxicated and ended up passing out in a bar bathroom. She was later carried to Cadet Thomas' dormitory room by Cadet Thomas and Appellant. Appellant was ultimately convicted of assault consummated by a battery and attempted abusive sexual contact by unbuttoning and

---

[4] That evening, Cadet MI told another cadet what had happened and filed a restricted report with the Academy's Sexual Assault Response Coordinator. A restricted report allows an alleged victim to receive assistance and support, but law enforcement is not notified of the allegation. After she later learned that Appellant had been accused of assaulting other women, she agreed to change her report to unrestricted and law enforcement began investigating the allegation.

unzipping her pants while she was substantially incapacitated in Cadet Thomas' dormitory room, and assault consummated by a battery for kissing her in that same room.[5] He was also convicted of two specifications of assault consummated by a battery after he engaged in a physical altercation with Cadet Thomas and another cadet in the hallway outside the dormitory room on that same evening.

*DuBay and Post-Remand Issues*

Former Cadet Eric Thomas testified at the *DuBay* hearing, along with two AFOSI agents. After the hearing concluded, Government counsel notified the military judge and trial defense counsel that another witness who testified against Appellant at his court-martial was also a CI for AFOSI. The convening authority did not enlarge the scope of the order so the military judge did not address this witness as part of the remand. The military judge at the *DuBay* hearing sealed the document identifying the witness and prohibited release to anyone outside of the case. The military judge made findings of fact and conclusions of law, ultimately concluding that the Government's failure to disclose former Cadet Thomas' CI status was harmless beyond a reasonable doubt.

Appellant contends some of the military judge's findings of fact and conclusions of law relating to former Cadet Thomas were erroneous. However, his primary argument is that the Government cannot meet its burden of demonstrating harmlessness without further fact-finding into the additional CI, as well as the informant status of any other witnesses in the case, and requests this court order another *DuBay* hearing. The Government argues this court is not authorized to order a second *DuBay* hearing as such a hearing is outside the scope of our superior court's remand in this case and that, regardless, such a hearing is unnecessary because the record already demonstrates that the failure to disclose the status of the second witness was also harmless beyond a reasonable doubt.

We now address the post-*DuBay* issues involving sealed matters concerning a second CI who testified as a witness in the court-martial. Unlike a typical informant identity issue governed by Military Rule of Evidence (Mil. R. Evid.) 507, in the case before us we have one (or two) witness(es) whose identities were made known to the parties, but whose *status* as CIs was not made known to the Defense (and possibly the trial counsel, but members of the legal office were aware of at least the status of former Cadet Thomas). In order to review the issue on remand as to whether or not the failure to identify the confidential informant status of a witness amounted to a discovery violation that was harmless beyond a reasonable doubt, we must analyze the evidence provided by each witness. Such analysis would unmistakably result in revealing the identity of the second

---

[5] After Appellant was found guilty of three specifications regarding this incident (attempted abusive sexual contact for unbuttoning and unzipping Ms. SW's pants, assault consummated by battery for that same conduct, and assault consummated by a battery for kissing her), the military judge merged the two assault specifications with the attempted abusive sexual contact specification for purposes of sentencing.

CI.  As such, other than former Cadet Thomas, we have only identified cadets who were victims.  Any other cadet witness is only generically referred to as a cadet.

*Background Regarding Cadet Thomas*

Former Cadet Thomas worked as a CI for AFOSI while he was enrolled at the Academy.  When that involvement began and what it entailed was disputed at the *DuBay* hearing.

It is undisputed, however, that former Cadet Thomas actively worked as a CI for AFOSI in late 2011 and throughout the first half of 2012, including during the time period of Appellant's court-martial.  It is also undisputed that the Government did not provide the Defense with any information regarding former Cadet Thomas' CI status prior to Appellant's court-martial in June 2012.  Furthermore, an AFOSI agent told former Cadet Thomas not to reveal this status during his pretrial interviews with trial defense counsel.

Based on his testimony at the *DuBay* hearing and his interview as part of an Inspector General investigation, excerpts of which were presented at the *DuBay* hearing and considered by the *DuBay* judge, if trial defense counsel had been informed of former Cadet Thomas' status and interviewed him prior to trial regarding his work with AFOSI, former Cadet Thomas would have provided the following:

> His involvement with [AFOSI] began in late 2010.  On 2 Oct 10, there was an off campus party, attended by many cadets, which was broken up by civilian police following a noise complaint.

> [AFOSI] began interviewing all cadets who were at the party, including himself, about drug use and a sexual assault allegation.

> It was during this interview that Special Agent (SA) M solicited him to become an [AFOSI] informant, that he agreed to do so, and completed certain paperwork regarding his agreement with [AFOSI].

> At an unspecified later point, SA M and another agent told him they had heard from other cadets that people do not trust Appellant and do not feel safe around him.

> SA M asked him to watch and track Appellant because he is likely to sexually assault someone.

SA M told him to get close to Appellant so he can provide [AFOSI] with information on what he observes, and that his effort to comply with this request is what led him to be invited to Appellant's room on the night in late March 2011 when Cadet MI was sexually assaulted.

He informed SA M about the March 2011 incident involving Appellant and Cadet MI shortly after it happened but SA M told him not to provide any details because the victim had made a restricted report. (Former Cadet Thomas ultimately provided [AFOSI] with information about this incident as part of his statement regarding the November 2011 incident involving Ms. SW).

The actions he took on the night of 4 November 2011 (when Ms. SW was assaulted) were done as part of his work tracking Appellant for [AFOSI].[6]

His work for [AFOSI] included his involvement with Appellant and his own misconduct that occurred as a result of that work. He also received demerits because of his work with [AFOSI].

Proper disclosure of Cadet Thomas' CI status would have also revealed that from the time Cadet Thomas initiated the contact in November 2011 through the time he testified for the Government at Appellant's trial in June 2012, both Cadet Thomas and AFOSI knew he was going to face disenrollment. Former Cadet Thomas hoped to avoid disenrollment and its collateral consequences of having to pay back the cost of tuition through his work with AFOSI.[7]

*Failure to Provide Discovery*

We review a *DuBay* judge's findings of fact under a clearly erroneous standard. *United States v. Wean*, 45 M.J. 461, 462–63 (C.A.A.F. 1997). We review a *DuBay* judge's

---

[6] It is undisputed that Cadet Thomas went through the formal process to become a confidential informant in December 2011. By this time, SA M was deployed and not present at the Academy. After the November 2011 incident involving Ms. SW, Cadet Thomas was interviewed by two other AFOSI agents as part of the investigation into the alleged sexual assault of SW. He told them everything he knew up to that point, to include specific information about the March 2011 incident involving Cadet MI (which was still a restricted report), and his knowledge of drug use by other cadets. After the agents informed him there was no record of him being a confidential informant, Cadet Thomas completed more paperwork at their request. He then provided written statements which documented his knowledge of incidents involving drug use by cadets other than Appellant. Cadet Thomas had periodic meetings with AFOSI agents in December 2011 and January 2012 which involved discussions and taskings in 20-30 ongoing drug cases.

[7] The defense was given access to Cadet Thomas' cadet personnel file, which indicated his history of academic and conduct problems while at the Academy, to include being on academic probation.

conclusions of law de novo. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001). An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

The defense counsel did not present any of the pre-trial discovery requests to the *DuBay* military judge. The *DuBay* military judge reviewed the transcript portion of the original record of trial, as well as a variety of exhibits presented at the *DuBay* hearing, some of which were also contained in the original record of trial. The record of trial had been supplemented prior to our superior court's remand to include the specific discovery request made by trial defense counsel. Consequently, in her written findings, she specifically stated that while the issue was framed as "harmless beyond a reasonable doubt" that standard is not supported by the evidence presented since there was not an explicit discovery request asking for this information. Nevertheless, the military judge applied the *Van Arsdall* factors and concluded that the failure to disclose former Cadet Thomas' status as a CI was harmless beyond a reasonable doubt. We agree with her legal conclusion that the failure to disclose was harmless beyond a reasonable doubt, but as discussed below, find some of her findings of fact to be clearly erroneous.[8]

At the *DuBay* hearing and before this court, the parties agree that the issue before us is whether the Government's failure to provide certain discovery relative to a witness' informant status was "harmless beyond a reasonable doubt." This standard is applicable where an appellant has demonstrated that the Government "failed to disclose discoverable evidence in response to a specific [defense] request." *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004).

R.C.M. 701(a)(6) "implements the Supreme Court's decision in *Brady v. Maryland*, [373 U.S. 83 (1963)]." *United States v. Williams*, 50 M.J. 436, 440 (C.A.A.F. 1999). The Government violates an accused's right to due process under *Brady* if it withholds evidence that is favorable to the defense and material to the accused's guilt or punishment. *United States v. Behenna*, 71 M.J. 228, 237–38 (C.A.A.F. 2012). "Evidence that could be used at trial to impeach witnesses is subject to discovery under these provisions." *United States v. Santos*, 59 M.J. 317, 321 (C.A.A.F. 2004) (citing *United States v Watson* 31 M.J. 49, 54 (C.M.A. 1990)).

If the withheld evidence was not specifically requested by the defense, the "harmless error" standard is applied: whether there is a "reasonable probability that, had the evidence

---

[8] As will be discussed later, we disagree with the *DuBay* military judge's findings concerning whether or not any of the AFOSI documentation concerning the work of the confidential informants would have been provided in discovery.

been disclosed, the result of the proceeding would have been different." *United States v. Coleman*, 72 M.J. 184, 186–87 (C.A.A.F. 2013) (quoting *Smith v. Cain*, 56 U.S. 73, 75 (2012) (noting that this is the standard by which the Supreme Court reviews all *Brady* cases).

In contrast, a constitutional error standard is applied in military cases where the defense has made a specific request for the undisclosed information. *Id.* at 187. This heightened standard is unique to military practice and reflects the broad nature of discovery rights granted to a military accused under Article 46, UCMJ, 10 U.S.C. § 846, and its implementing rules, which provide the accused with greater statutory discovery rights than does one's constitutional right to due process.[9] *Id.* at 186–87; *Roberts*, 59 M.J. at 327.

Thus, where the information was the subject of a specific defense request, an appellant is entitled to relief unless the Government can prove, as a matter of law, that the nondisclosure was harmless beyond a reasonable doubt, a burden which cannot be met if disclosure of the favorable evidence "might have affected the outcome of the trial." *Coleman*, 72 M.J. at 187.[10] "Harmless beyond a reasonable doubt is a high standard, but it is not an impossible standard for the Government to meet." *United States v. Gonzalez*, 62 M.J. 303, 306 (C.A.A.F. 2006).

We review de novo the question of whether a constitutional error was harmless beyond a reasonable doubt. *United States v. Long*, 64 M.J. 57, 66 (C.A.A.F. 2006). This determination must be made in light of the entire record. *United States v. Morris*, 52 M.J. 193, 197 (C.A.A.F. 1999). Other than that direction, the various military appellate decisions discussing such discovery violations do not provide guidance applicable to such determinations, nor do they address how to quantify whether certain evidence "might have affected" the trial's outcome.

We find instructive, however, the standard applied in a similar context where constitutional errors are evaluated for harmlessness beyond a reasonable doubt. For example, when a military judge violates an accused's rights under the Confrontation Clause by limiting his ability to impeach a witness' credibility, the burden is on the Government "to show that there is no reasonable possibility that the error contributed to the contested findings of guilty." *United States v. Jasper*, 72 M.J. 276, 282 (C.A.A.F. 2013). In that context, the "inquiry should focus on whether the [error] 'essentially deprived Appellant of [his] best defense' that 'may have tipped the credibility balance in Appellant's favor.'"

---

[9] Article 46, UCMJ, provides trial defense counsel with the "equal opportunity to obtain witnesses and other evidence in accordance with" the rules prescribed by the President. Article 46, UCMJ, 10 U.S.C. § 846

[10] This test previously appeared in *United States v. Hart*, 29 M.J. 407, 409-10 (C.M.A. 1990), which cited to *United States v. Agurs*, 427 U.S. 87, 104 (1976) for the proposition that, where the prosecution fails to disclose specifically requested items of discovery, the test is whether that evidence might have affected the outcome of the trial. Later in that decision, our superior court described the test as requiring a demonstration that the failure to disclose the evidence is harmless beyond a reasonable doubt. *Id.* at 410; *see also United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004); *United States v. Jackson*, 59 M.J. 330, 334 (C.A.A.F. 2004).

*Id.* (quoting *United States v. Collier*, 67 M.J. 347, 356 (C.A.A.F. 2009). It is not necessary to conclude that Appellant's defense would have succeeded. *Id.* When the error violates the accused's right to confront the witnesses against him, a reviewing court applies a balancing test that requires it to weigh:

> [T]he importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

We find this Confrontation Clause situation to be sufficiently analogous to the constitutional discovery violation in this case so as to allow us to apply its standards in our review of the discovery issue before us.

At the *DuBay* hearing, the Government took the position that the informant status of these two witnesses was not subject to disclosure as part of the pretrial discovery process in this case. On appeal, the Government does not contest that the informant status of these two witnesses was subject to disclosure as part of the pretrial discovery process in this case.[11] We agree with the Government's appellate counsel. The Defense discovery request included a request for "(1) any evidence tending to diminish the credibility of potential witnesses to include any evidence of bias bearing on the witness' credibility, (2) any evidence that may reasonably tend to negate appellant's guilt or that is favorable to the appellant, (3) notice of any leniency offered or granted to potential witnesses, and (4) *any information received from an informant*." (Emphasis added). In light of the evidence presented at the *DuBay* hearing, we find this evidence regarding CIs would be responsive to those requests.

In this case, the *DuBay* military judge addressed the procedure that *could* have been followed at trial had the Government requested the military judge conduct an in camera review pursuant to Mil. R. Evid. 506. What the *DuBay* military judge does not include is what privilege would have been asserted by the Government to do so. Additionally, the *DuBay* military judge does not address the language in Mil. R. Evid. 507(c)(1) that requires the Government to identify a CI if they testify as a witness for the prosecution. At the *DuBay* hearing, 36 pages of former Cadet Thomas' AFOSI dossier, redacted by AFOSI, was provided to the Defense and included in the record as Appellate Exhibit (AE) LIX. The Government indicated that it had been redacted by AFOSI based on "relevance and tradecraft" in light of the fact that much of what former Cadet Thomas worked on were un-

---

[11] Government appellate counsel focuses on whether or not the information would have been admissible, which is not the question before us.

related cases. Later, after an in camera review, the *DuBay* military judge provided the entire unredacted dossier to trial and defense counsel, with an oral protective order allowing them to review it. Afterwards it was to be collected by the Government and destroyed.[12] Trial defense counsel later offered a single page from the unredacted dossier as AE LXXXIV.

Despite the production of the dossier to counsel at the hearing, the *DuBay* military judge's findings of fact and conclusions of law stated:

> [I]nformation about Cadet Thomas' status and history as a CI very likely would not have been disclosed to counsel as it was neither relevant nor necessary. Having a motive to assist [AFOSI] with unrelated investigation to avoid disenrollment does not translate to having a motive to testify favorable to the prosecution to avoid disenrollment.

We disagree with this conclusion. We find that Appellant's defense counsel should have been informed that former Cadet Thomas was an informant and should have received some portions of former Cadet Thomas' AFOSI dossier in discovery—at least the 36 redacted pages found in AE LIX of the *DuBay* record—which included statements about his motivation to serve as a confidential source for AFOSI. *See* Mil. R. Evid. 507(c)(1) and (2). For example, concerned about his high number of demerits, Cadet Thomas told AFOSI in December 2011 that he feared being disenrolled and "will do anything he can to remain at [the Academy] and keep his career in the Air Force." The Defense would also have learned that Cadet Thomas' disenrollment process had been delayed at the request of AFOSI so he could continue to work as a CI and testify at several courts-martial, including that of Appellant.

This information revealed by former Cadet Thomas about his work as an informant would have provided substantial ammunition for the Defense to use in their efforts to impeach him and undercut his credibility. We recognize that other evidence from the *DuBay* hearing and the Inspector General investigation contradicts aspects of former Cadet Thomas' story, including his claim that SA M told him to track Appellant based on AFOSI's suspicions about him.[13] Regardless of the accuracy of former Cadet Thomas' claims at the *DuBay* hearing, we find that this is the version of events he would have relayed to trial defense counsel prior to Appellant's trial and how he would have testified at that trial.

---

[12] The unredacted dossier was not included as an Appellate Exhibit in the *Dubay* Record of Trial.

[13] We note that the *DuBay* military judge gave little weight to former Cadet Thomas' testimony because she found it to be "rehearsed", inconsistent with other evidence and self-serving. However, she indicated that he had none of these credibility issues at trial.

By failing to provide the Defense with information about the CI status of the two cadets, the Government essentially precluded the defense from impeaching their credibility and motivation for being involved in the situation involving Appellant and his court-martial.  At the *DuBay* hearing, Appellant's counsel indicated "[h]ad we known the full picture about Thomas, we may have posited a different theory . . . . . . . That potential exists."   In *United States v. Bagley*, 473 U.S. 667, 682–83 (1985), the Supreme Court said:

> [A]n incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued. . . . And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.

We also recognize that the Government may have elected not to call former Cadet Thomas as a witness once this impeachment ammunition became known to the Defense. Given the posture of this case on appeal, however, we are evaluating whether disclosure of this evidence favorable to the defense "might have affected the outcome of the trial," *Coleman*, 72 M.J. at 187, a standard which we apply to the "trial" the Government elected to present, not the trial it would have presented if former Cadet Thomas' status had been fully known prior to trial.  To the extent possible based on the record before us, we conduct the same analysis relative to the second cadet identified as an informant.

*Trial Evidence*

At trial, former Cadet Thomas testified about each of the charges faced by Appellant.[14]  He drank alcohol with Appellant, Cadet MI, and another cadet in Appellant's dormitory room on the night Cadet MI alleged Appellant sexually assaulted her, and spoke to Cadet MI after the incident.  Eight months later, he was also drinking with Appellant and other cadets on the night Appellant allegedly sexually assaulted Ms. SW.  He saw Ms. SW both before and after the incident, and he also was the named victim in one of the battery charges based on an altercation that night.

As noted above, we are evaluating this issue on appeal under the assumption that trial defense counsel would have used the non-disclosed evidence to fatally damage former

---

[14]  In addition to testifying about the incidents where Appellant was convicted, former Cadet Thomas was also present and provided testimony regarding another sexual assault where Appellant was acquitted.

Cadet Thomas' credibility, and that his inculpatory testimony against Appellant would therefore be wholly disregarded by the panel. We presume that trial defense counsel would have been able to similarly harm the credibility of the second cadet informant who testified at Appellant's trial. We also assume that the Defense would have successfully elicited testimony from former Cadet Thomas that he was tracking Appellant at the request of AFOSI and that former Cadet Thomas believed he was acting as a CI when he participated in those incidents.[15]

With those parameters in mind, we evaluate whether the Government has demonstrated that nondisclosure of the informant evidence was harmless beyond a reasonable doubt. The Government's brief on this issue focuses on its argument that the evidence of Appellant's guilt was overwhelming, including Appellant's admissions to most of the conduct of which he was found guilty. The overall strength of the Government's case is one of the factors to weigh in evaluating the harmlessness of the discovery violation in this case. *Van Arsdall*, 475 U.S. at 679.

Applying the above concepts, we find the CI information was potentially fertile grounds for impeachment and thus was discoverable. *Santos*, 59 M.J at 321. However, as described below, we find the nondisclosures harmless beyond a reasonable doubt as we are not convinced that disclosure of this evidence prior to trial "might have affected the outcome" of that trial. We find there is no reasonable possibility that the disclosure error contributed to the contested findings of guilty.

*1. Late March 2011 incident involving Cadet MI*

In Charge II, Appellant was convicted of engaging in sexual contact with Cadet MI by placing her hand on his penis without legal justification, lawful authorization or her permission. On the night in question in late March 2011, Cadet MI was drinking alcohol in Appellant's dormitory room with several other cadets while watching movies. After she became ill, she testified that she fell asleep in one of the beds in the room. She described waking up when a hand or arm brushed against her head, followed by someone getting into bed behind her. Based on the person's body size, Cadet MI thought it was Appellant. Cadet MI testified that she froze and did not say anything because she was afraid of what he may do since he had been drinking. She told the panel that the person grabbed her hand, pulled it behind her back, and placed it on his penis. She almost immediately pulled her hand away, got out of the bed, and vomited into a nearby trashcan. Cadet MI then realized Appellant had been the person in the bed with her and they were now alone in the room. She left the room soon thereafter.

---

[15] Notably, former Cadet Thomas did not testify to conduct that, if performed by a law enforcement agent, would have raised a potential defense of entrapment. However, Appellant's trial defense counsel did not rule out the possibility that he might have pursued that strategy if he was aware of former Cadet Thomas' CI status.

Appellant was interviewed twice under rights advisement regarding the incident involving Cadet MI. During his first interview on 5 December 2011, he denied touching her in any manner. Three days later, he was interviewed again and this time he admitted getting in bed with Cadet MI when she was intoxicated, pulling down his pants and underwear, placing her hand on his leg and then positioning himself so her hand touched his penis for 10-15 seconds.

Appellant described himself as having gone through a process of denial and then admission and repentance. Appellant said he had told his parents and they were disappointed in him, and that he had not forgiven himself. The Government also introduced a text Appellant sent to his mother on 1 May 2011 regarding the incident. In that text, Appellant asked his mother to pray for him as he had let himself:

> become a vessel of ignorance and lude [sic] behavior. I have disgraced myself as a man as a Claxton and as a human being. I inappropriately touched a female a while back and have probably caused her di[s]tress[.] I have been trying my best to do right and I have gotten caught up in sin. I am not in any trouble per [se] but spiritually I am . . . . I have apologized to all parties and now I am saying sorry to you for the disappointment it has brought. I am a work in progress and I will continue my walk with God even though I was led astray.

We find the Government's case to be strong relative to this specification. Appellant admitted, under rights advisement, to getting into bed with an intoxicated Cadet MI and maneuvering himself into a position that placed his exposed penis in contact with her hand. That admission was corroborated by Cadet MI's testimony about the incident. Although Cadet MI testified Appellant grabbed her hand and placed it on his penis, Appellant's admission to moving his body so that her hand touched his penis would be sufficient to convict Appellant of wrongful sexual contact. *MCM*, Part IV, ¶ 45.a.(t)(2) (sexual contact includes "intentionally causing another person to touch . . . the genitalia of any person"). He also told investigators that he believed Cadet MI was "passed out/incoherent" during this event and that his actions were "a hundred percent" wrong.

Both cadet informants testified at trial regarding this incident. Although neither witnessed the incident, both spoke to Appellant and Cadet MI separately later in the evening. Cadet MI told one cadet that Appellant had grabbed her hand and placed it on him but she told the other cadet that Appellant had put her hand down his pants and had stopped when she protested. The two cadets went to talk to Appellant that night and he denied doing anything inappropriate, and he repeated his denial the next day. He later told the two cadets that he may have done something wrong and forwarded one of them the text he had sent to his mother, telling the cadet he could show it to Cadet MI to show her he was owning up to his conduct. We conclude the testimony by the two cadets about this

incident was relatively unimportant in relation to Appellant's own admissions and was largely cumulative to other testimony or evidence at the trial.

## 2. *November 2011 Incident Involving Ms. SW*

Appellant was convicted of  assault consummated by battery and attempted abusive sexual conctact of Ms. SW, a former cadet, by unbuttoning and unzipping her pants while she was substantially incapacitated in a dormitory room, and assault consummated by a battery for kissing her in that room.[16]

Ms. SW was a former cadet at the Academy who was living in the local area.  On the night of 4 November 2011, she accepted an invitation from Cadet Thomas to go to dinner with him.  The two went to a local restaurant where they met up with several other cadets, including Appellant.  Ms. SW drank several alcoholic drinks and the group then returned to the Academy.  A short time later, the group decided to return downtown.  On the way, Ms. SW drank vodka provided by Appellant.  By the time she arrived at the bar, Ms. SW told them she was too intoxicated to go inside.  Ms. SW's next memory was walking into Cadet Thomas' dormitory room, lying down, and hearing him say he will be right back.  She next remembers awakening in an ambulance.

Due to Ms. SW's inability to recall what happened to her inside the dormitory room, the Government called four other cadets, including the two cadet informants, to testify about their observations that evening.

The two non-informant cadets, both of whom described themselves as friends of Appellant, testified about Ms. SW becoming extremely intoxicated while downtown, requiring cadets to carry her to the car so they could return to the Academy.  Ms. SW was ultimately carried unconscious into a dormitory room and placed on former Cadet Thomas' bed.  The two cadets testified that Ms. SW's clothes were not in disarray when they left her in the bed.  Former Cadet Thomas' roommate was asleep in his bed at this time.  The two cadets testified that Appellant was also in the room at this time but failed to leave with them when they went with former Cadet Thomas to find a mattress for him to use since Ms. SW was in his bed.  Instead, Appellant closed and locked the door behind them.  The two cadets described knocking loudly on the door.  A few minutes later, Appellant opened the door and the two cadets saw the room was dark.  Appellant then attempted to shut the door again but the two cadets, along with former Cadet Thomas, pushed their way inside. When the light was turned on, the two cadets saw Ms. SW's shirt was now pushed up to her breasts and her pants were unbuttoned with her underwear showing.  The resulting commotion awoke former Cadet Thomas' roommate, who also saw Ms. SW's pants unbuttoned and her shirt pulled up.  It also brought a third cadet into the room, and he also observed her pants unbuttoned and unzipped and her shirt pulled up.

---

[16]  The military judge merged the two assault specifications with the attempted abusive sexual contact offense for sentencing purposes.  See fn. 5.

When Appellant was interviewed under rights advisement on 5 and 8 December 2011, he was asked about the events of 4 November 2011. He described drinking with Ms. SW and other cadets (including former Cadet Thomas) while off campus. He told investigators that he ended up extremely intoxicated and was unable to remember all the events that transpired after they returned to the Academy. He recalled being in former Cadet Thomas' dormitory room with former Cadet Thomas, two other cadets and Ms. SW, who was talking incoherently and who then passed out in former Cadet Thomas' bed. As the male cadets started leaving, Appellant remembered one of them saying something offensive that led him to respond and then lock the door before the cadet could re-enter the room. Appellant told investigators that he put his arm around Ms. SW and that he believed she was "passed out/incoherent" when he did so. He also "strongly believed it [i]s possible" he unbuttoned Ms. SW's jeans but he was not certain since he could not recall doing so or seeing her pants in this condition.

We find the prosecution's case to be strong overall relative to the allegation that Appellant unbuttoned and unzipped Ms. SW's pants while she was substantially incapacitated. He also indicated his strong belief that he had unbuttoned her pants during this incident. His belief in this regard is corroborated by the testimony of the four non-informant cadets who saw Ms. SW's clothing before and after she was locked in the room with Appellant.

Both cadet informants testified at trial regarding this incident. We conclude the testimony by the two informant cadets about this incident was relatively unimportant and was cumulative to other testimony or evidence at the trial.

### 3. November 2011 Assaults of Two Cadets

Appellant was also convicted of two specifications of assault consummated by a battery for striking Cadet DB and striking and choking former Cadet Thomas after they came back into the dormitory room after he locked the door.

Under rights advisement, Appellant admitted striking former Cadet Thomas and Cadet DB but essentially claimed to have done so in self-defense after the two cadets attacked him after he unlocked the dormitory room. He also explained that some of the other cadets had provoked his reaction by calling him a rapist.

Multiple cadets testified about the altercation that led to these allegations, including former Cadet Thomas and Cadet DB. Cadet DB was one of the three cadets who pushed their way into the dormitory room after Appellant unlocked the door in response to their loud pounding. He testified that he grabbed Appellant by the shoulders and pulled him out of the room to prevent him from shutting the door again, and that Appellant hit him in the jaw. Another cadet testified about seeing this blow, while former Cadet Thomas

described it as a "shoving match." Former Cadet Thomas separated the two and Appellant left the area. Cadet DB, former Cadet Thomas, and the third cadet went into the dormitory room and saw Ms. SW with her clothes in disarray.

As they discussed what to do next, Appellant returned to the room. All three cadets testified that Appellant rushed into the room, as did former Cadet Thomas' now-awake roommate and another cadet who had entered the room after hearing the commotion. Cadet DB testified that Appellant again struck him in the face, as corroborated by the testimony of three of the other cadets in the room (including former Cadet Thomas).

Former Cadet Thomas again attempted to separate the two cadets. He testified that Appellant grabbed him by the throat, hit him in the face and pushed him down on the bed until several cadets forcibly separated the two. The four other cadets in the room all testified that they saw Appellant choking former Cadet Thomas and one also saw Appellant strike him.

We find the prosecution's case is strong relative to the allegation that Appellant struck Cadet DB and struck and choked former Cadet Thomas. Also, in light of the other eyewitnesses who testified, former Cadet Thomas' testimony was cumulative to that testimony and thus relatively unimportant in proving these specifications. The testimony of the other cadets largely corroborated Cadet Thomas' testimony, as did Appellant's admission to striking both cadets.

*Specified Issues*

The remand order from our superior court set aside our original opinion, returned the case for a *DuBay* hearing on the certified issue, after which the record would be transmitted to this court for further review under Article 66(c), UCMJ, 10 U.S.C. §866(c). Article 66(c), UCMJ, requires this court to affirm only such findings of guilty, and the sentence or such part or amount of the sentence, *as it finds correct in law.*

We are cognizant of the rulings of our superior court in *United States v. Smith*, 41 M.J. 385 (C.M.A. 1995) and *United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997) concerning this court's authority, or lack thereof, to consider issues outside the scope of the remand. In *Smith*, the issue before our superior court was whether this court's failure to consider supplemental assignments of error was erroneous. In holding that it was not, our superior court explicitly stated that whether a service court had discretion to consider additional issues was not before them, expressly acknowledging the dissenting opinion by Judge Wiss in *United States v. Jordan*, 38 M.J. 346 (C.M.A. 1993), for the proposition that appellate courts could consider "closely related" issues where the "record is adequately developed." *Smith*, 41 M.J. at 386.

The law regarding a court of criminal appeals' scope of review in a mandate case thus appears unsettled.[17] But given the rather broad mandate in this case (this court will conduct "further review under Article 66(c), [UCMJ]," *Claxton*, 73 M.J. at 478), we believe we are not exceeding its scope. It is back to us for direct review, and at this stage, as our superior court has articulated, "we apply the clear law at the time of appeal, not the time of trial." *United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010) (citing *United States v. Harcrow*, 66 M.J. 154, 159 (C.A.A.F. 2008)). *Hills* and *Adams* having been decided since our previous, set-aside opinion, and the case now being back before us for direct review, we find that we have an adequately developed record and an appropriate mandate to conduct our Article 66 review applying those cases.

*Corroboration of Admissions*

Appellant was interviewed on two dates under rights advisement about the allegations that led to his court-martial. Portions of those taped interviews were provided to the court-martial panel, along with his four written statements (two statements provided on each occasion). At trial, Appellant did not object to the admission of the statements or recordings based on lack of corroboration or any other grounds.[18] Appellant forfeited, rather than waived, the error by failing to object at trial. *United States v. Humphries*, 71 M.J. 209, 211 (C.A.A.F. 2012).

If Appellant forfeited an objection by failing to raise it at trial, we review for plain error. *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009). Under a plain error analysis, we will grant relief in a case of non-constitutional error only if an appellant can demonstrate that (1) there was error; (2) the error was plain and obvious; and (3) the error materially prejudiced a substantial right of the accused. *United States v. Clifton*, 71 M.J. 489, 491 (C.A.A.F. 2013).

Mil. R. Evid. 304(g) reads, in pertinent part:

---

[17] This court, along with at least one of our sister courts, have considered issues outside the scope of the remand and our superior court has not overturned or reviewed those decisions on that basis. *See United States v. Quiroz*, 57 M.J. 583, 586 (N-M. Ct. Crim. App. 2002); *United States v. Rodriguez*, 57 M.J. 765, 773 (N-M. Ct. Crim. App. 2002); *United States v. Jones*, ACM 37528 (rem) (A.F. Ct. Crim. App. 16 October 2013) (unpub. op.); *United States v. Stewart*, ACM S31685 (f rev) (A.F. Ct. Crim. App. 17 April 2013) (unpub. op.).2013 CCA LEXIS 332 (AFCCA 2013).

[18] Appellant also did not object when the military judge stated he was not going to give the panel any instruction on his confessions or admissions because there was no issue as to their voluntariness. *See United States v. Duvall*, 47 M.J. 189 (C.A.A.F. 1997) (once a confession or admission is admitted into evidence after adequate corroboration is found, the panel may consider any corroborating evidence in deciding what weight to give the admission or confession).

An admission or a confession[19] of the accused may be considered as evidence against the accused . . . only if independent evidence . . . has been admitted into evidence that corroborates the essential facts admitted to justify sufficiently an inference of their truth. . . . If the independent evidence raises an inference of the truth of some but not all of the essential facts admitted, then the confession or admission may be considered as evidence against the accused only with respect to those essential facts stated in the confession or admission that are corroborated by the independent evidence.[20]

Shortly after the *DuBay* hearing was held in this case, our superior court issued its decision in *United States v. Adams,* 74 M.J. 137 (C.A.A.F. 2015), which explained that courts must apply Mil. R. Evid. 304's "independent evidence" corroboration requirement to *each* essential fact contained in the admission that the Government wants to admit into evidence. We thus directed the parties to brief on whether adequate independent evidence was admitted into evidence to corroborate the essential facts of Appellant's pretrial admissions.

In his brief, Appellant states he does not concede that any of his statements complied with Mil. R. Evid. 304(c)'s admissibility prerequisite, but he only specifically challenges the findings of one specification on these grounds. We agree with Appellant regarding that specification but find the admissions as to the other specifications were adequately corroborated by sufficient independent evidence.

As discussed previously, Appellant's admission to his involvement in the incident involving Cadet MI and the assaults on Cadets DB and Thomas are corroborated by independent evidence in the form of eyewitness testimony. Similarly, Appellant's admission about his conduct related to Cadet SW's pants is corroborated by eyewitnesses.

Appellant's admission that he kissed Cadet SW when she was unconscious, however, is not corroborated by any independent evidence. We thus find that it was error for the military judge to admit that portion of Appellant's statement as proof that he assaulted Cadet SW by kissing her, in the absence of sufficient corroboration. The

---

[19] As used in this rule, a "confession" is an acknowledgment of guilt while an "admission" is a self-incriminating statement falling short of an acknowledgment of guilt, even if it was intended by its maker to be exculpatory. Mil. R. Evid. 304(c)(1)–(2).

[20] Through an executive order signed on 26 May 2016, the President modified Mil. R. Evid. 304(c)(1) to instead require only that the independent evidence "tend to establish the trustworthiness of the admission or confession." Exec. Order No. 13,730, 81 Fed. Reg.FR 33331, 33350 (26 May 2016). That modified rule is inapplicable here. Although the executive order states it is "effective immediately," it also states, in pertinent part, that any "action begun prior to the date of this order . . . may proceed in the same manner and with the same effect as if these amendments had not been prescribed." *Id.* at 33331; *see also United States v. Nichols*, 6 C.M.R. 28, 32 (C.M.A. 1952).

absence of corroboration was plain and obvious. As the only evidence to support Appellant's conviction of that specification is his uncorroborated admission that he engaged in this conduct, the error materially prejudiced Appellant. That conviction cannot be affirmed. We, therefore, set aside and dismiss with prejudice Specification 3 of Charge III.

We note, however, the military judge merged this specification with the attempted abusive sexual contact charge for sentencing purposes. In light of this, we find Appellant's improper conviction for this assault did not prejudice him during sentencing, and thus, reassessment by this court or a sentence rehearing is not required. For the same reason, we find that a rehearing on this specification would not be appropriate.

*Improper Admission of Propensity Evidence*

As addressed earlier, while this case was pending review on remand, our superior court issued its decision in *Hills*, 75 M.J. 350, involving the use of charged misconduct as propensity evidence pursuant to Mil. R. Evid. 413 as well as the consequential spill-over and propensity instructions. We directed the parties to brief on whether the findings and sentence must be set aside in light of the military judge's decision to admit propensity evidence and provide an instruction similar to that in *Hills*.

After careful consideration, we find that Appellant is not entitled to relief.

In *Hills*, our superior court determined the military judge erred in admitting three charged sexual assault offenses involving a single victim as propensity evidence. In so holding, the court noted that because the evidence of a charged sexual assault was already admissible to prove the underlying offense, the use of Mil. R. Evid. 413 was error.

> We hold that because the evidence of the charged sexual misconduct was already admissible in order to prove the offenses at issue, the application of [Mil. R. Evid.] 413—a rule of admissibility for evidence that would otherwise not be admissible—was error. Neither the text of [Mil. R. Evid.] 413 nor the legislative history of its federal counterpart suggests that the rule was intended to permit the Government to show propensity by relying on the very acts the Government needs to prove beyond a reasonable doubt in the same case.

*Id.* at 352.

In addition to finding the military judge erred in admitting charged offenses as propensity evidence, the court ruled the military judge's spill-over and propensity instructions were improper as the court members were provided with "directly

contradictory statements about the bearing that one charged offense could have on another." *Id*. at 357. In so finding, the court noted it could not determine if "Appellant's right to a presumption of innocence and to be convicted only by proof beyond a reasonable doubt was not seriously muddled and compromised by the instructions as a whole." *Id*. Given that the instructional error raised constitutional due process concerns, the court examined the prejudicial effect of the error under the standard of harmless beyond a reasonable doubt.

In this case, the Government argues that *Hills* should not be applied because it involves multiple sexual assault victims. While our superior court specifically recognized the purpose of Mil. R. Evid. 413 is to address recidivism and, therefore, permits the bolstering of a victim's credibility through the use of evidence from other victims of an accused's sexual misconduct, it does not appear to us that the ultimate holding in *Hills* would have been different had the charged offenses involved multiple victims. We, therefore, decline the Government's invitation to limit *Hills*.

Moreover, we note the primary defect raised in *Hills* related to the language contained within the propensity and spillover instructions provided to the panel members. As similar instructions found deficient in *Hills* were given to the court members in this case, it is through this lens that we now examine the impact of the propensity instruction errors in Appellant's case. Appellant's trial defense counsel objected to the Mil. R. Evid. 413 instruction and requested that the "standard spillover" instruction be given rather than the one proposed by the military judge. Although the instruction in this case differed somewhat from that given in *Hills*, the distinctions do not alter the analysis.

We review de novo whether a constitutional error was harmless beyond a reasonable doubt. *United States v. Grijalva*, 55 M.J. 223, 228 (C.A.A.F. 2001). A constitutional error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Stated differently, "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Id*. (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). In answering this question, we consider the entire record. *Van Arsdall*, 475 U.S. at 681.

Applying this standard, we find any error surrounding the admission of propensity evidence in this case to be harmless beyond a reasonable doubt as it applies to the charged offenses involving both Cadet MI and Ms. SW. Unlike the *Hills* case, where the evidence was weak and there was no eyewitness testimony, the evidence supporting the charges of which Appellant was convicted was extremely strong. The testimony of Cadet MI and Ms. SW was strong, consistent over time, and corroborated by a number of other witnesses, as addressed earlier. And perhaps most harmful of all were Appellant's own admissions.[21]

---

[21] Excluding the assault consummated by a battery for kissing Ms. SW addressed previously.

Conversely, the evidence regarding the charges involving Ms. KA was weak. The fact that Appellant was acquitted of the charges involving Ms. KA further undercuts the idea that the instruction may have contributed to the findings of guilty.

We are convinced beyond a reasonable doubt that propensity evidence did not contribute to the guilty verdict regarding all of the offenses involving Cadet MI or Ms. SW.

*Conclusion*

Specification 3 of Charge III is **SET ASIDE AND DISMISSED WITH PREJUDICE**. The remaining findings and the sentence are **AFFIRMED**. The approved findings, as modified, and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant remains. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. § 859(a), 866(c).

FOR THE COURT

KURT J. BRUBAKER
Clerk of Court